# UNITED STATES OF AMERICA
# DISTRICT COURT

Boston, ss.                                                   Docket No.

| Venifa White, | ) |
|---|---|
| Plaintiff | ) |
| v. | )  **COMPLAINT** |
| Davita, Inc., | ) |
| Defendant | ) |

## Introduction

This is a complaint for sexual harassment (hostile environment), failure to protect, and retaliation. The Defendant corporation hired and employed a male individual who was the subject of multiple complaints of sexual misconduct in the workplace. The Plaintiff was singled out by this individual and was subjected to months of lewd, degrading, and sexual comments. Finally, the Plaintiff was sexually assaulted in the workplace in an incident that resulted in the Defendant being charged, and sentenced, criminally. After the incident, human resources found that there was no basis for the complaint, failed to discipline the attacker, and attempted to force the Plaintiff to work with her attacker despite her complaints and requests. After several years with no discipline, the Plaintiff was suddenly recipient of discipline for attendance. Female friends of her attacker would insult her and intimidate her on the job. Again, her complaints were ignored. The detective in charge of the criminal investigation stated, in writing, that Davita and its employees were uncooperative and obstructive to the investigation of the complaint of the

1

plaintiff. Indeed, Davita took no action whatsoever until counsel intervened on her behalf. By that time, the Plaintiff was in psychiatric counseling, fearful for her safety at work, and so distrustful of her coworkers and management that she could no longer work there.

## Parties

1. Complainant Venifa White is an individual who resides in Brookline, Massachusetts.
2. Respondent Davita, Inc., is a national corporation with a place of business in Brookline, Massachusetts.
3. Davita Inc., is vicariously responsible for the acts, omissions, and errors of its employees, agents, and or servants.

## Jurisdiction

4. Jurisdiction is proper in this Court because this action is brought to remedy discrimination on the basis of sex in the terms, conditions and privileges of employment and to remedy retaliation against an employee for activity protected under Title VII all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and M.G.L. c. 151B. The Plaintiff timely filed these claims in state and federal agencies before removing the case to this Court.

## Venue

5. Venue is proper because all of the events at issue in this Complaint occurred in Norfolk county, Massachusetts.
6. Ms. White has a bachelor's degree in nursing and is currently working towards obtaining a master's degree. She has worked as a medical assistant and/or Registered Nurse since 2002.
7. Ms. White worked as a nurse for Davita, Inc., for several years until February of 2011.
8. Mr. Stahl Jean-Guiles was a coworker at the Brookline facility.
9. During the months leading up to January 11, 2011 Mr. Jean-guiles engaged in a pattern of inappropriate sexual conduct directed towards Ms. White.
10. On several occasions how would touch her back and legs. On one such occasion, Ms. White was bending over to pick up a needle and was wedged into a small space between a patient bed and a wall. Mr. Jean-Guiles attempted to rub his crotch and legs against her buttocks.

11. Mr. Jean-Guiles also made several sexually based comments to her including, but not limited to, telling her that:

    a. "You have a mouth like a whore; don't be offended that's a compliment"

    b. "You are the type of woman that needs to be beaten in order to control because you don't know how to act."

    c. "You have a body like a whore."

    d. "You have a very sexual mouth; that's why you have that over-bite."

12. Ms. White found Mr. Jean-Guiles leering at her in a manner that made her feel uncomfortable and degraded on countless occasions. On such occasions she would catch him staring at her breasts, her cleavage if she was unfortunate enough to crouch low without knowing he was present, and her backside when she was unfortunate enough to find him behind her.

13. Mr. Jean-Guiles asked her out on several occasions; an invitation that she always rejected. He would also ask for her cell phone number so that he could call her out of work. Ms. White declined these requests as well.

14. In response, Mr. Jean-guiles went so far as to call her home and attempt to coerce the phone number from her minor child. He told the child that "mommy had an emergency at work" and that he needed to "get in touch with her on her cell phone right away." There was no emergency at work nor was there any legitimate, work related basis for him to call her on her private telephone.

15. Ms. White made several complaints to managers and coworkers. She was informed that Mr. Jean-Guiles was married to a manager at the facility and that making complaints would only "cause trouble for her." She was also informed that several other female employees were dealing with similar issues with the same employee.

### The Assault

16. On January 11, 2011 Ms. White stayed at work after closing time in order to finish work tasks. She was in the kitchen area cleaning dishes and believed that she was alone in the building after saying goodbye to several of her colleagues.

17. Mr. Jean-guiles entered the room from behind her and did not speak until he was close enough to put his hands on her shoulders. She jumped and spun around in a frightened panic. He again placed his hands on her shoulders and said "give me a hug." She said no and tried to walk away from him. At this point, he pinned her to the wall by her

shoulders and again attempted to hug her. He finally let her go when she began screaming at the top of her lungs.

18. When he let her go, she slumped to the floor, in tears. Mr. Jean-Guiles stood over her and laughed. He then slowly walked out of the room.

19. Ms. White took a few moments to compose herself. Immediately after the incident she was sobbing and in a full panic. It was her belief that her coworker intended to rape her when he pushed her against the wall, tried to kiss her, and refused to let her go despite her yelling.

### The Investigation Conducted by Davita

20. Ms. White immediately informed her supervisor, Ms. Kathleen Smith on January 12, 2011. She was informed that an investigation would be conducted by Ms. Ingrid Leon from "people services."

21. Ms. White informed the Investigator that she could not work with Mr. Jean-Guiles and asked that their schedules be changed so that she would not need to work with him. She informed the investigator of all the details of the attack and other sexual conduct that Mr. Jean-Guiles directed at her. She also notified the investigator of the names of other coworkers who could substantiate and corroborate her claims regarding her harasser.

22. On January 24, 2011 the Investigator told Ms. White that the allegations could not be substantiated, that she was expected to return to work, and that she would be scheduled to work with Mr. Jean-Guiles.

23. On January 28, 2011 the Investigator sent an email outlining the key points of the discussion on the 24th.

### The Police Investigation

24. Ms. White first contacted the Brookline Police Department on January 17, 2011 due to the fact that she was expected to work alongside her attacker and she did not believe that the investigation by Davita was being conducted in a thorough and efficient manner.

25. On January 17 she was interviewed by a Sergeant. The Sergeant also interviewed Mr. Jean-Guiles.

26. During that interview Mr. Jean-Guiles claimed that he and Ms. White engaged in several consensual sexual conversations. He claimed that he tried to hug Ms. White on January 11 but that she did not want to hug him back.

4

27. The Sergeant's report was reviewed by a more seasoned investigator, Detective Malloy, two days later on January 19, 2011. She reopened the case and was able to interview Ms. White on January 28, 2011.[1]

28. On January 28, 2011 Ms. White made statements to Detective Malloy that were consistent with her statements to the other officers and the Davita Investigator.

29. Detective Malloy contacted the Davita Investigator. The Detective informed her that Mr. Jean-Guiles had admitted to making sexual comments and trying to hug Ms. White when he was interviewed by police. Ms. Leon, the Davita Investigator, stated that she would re-open the investigation and await the results of the police investigation.

30. Detective Malloy faxed a copy of the original police report to Ms. Leon and promised to send a copy of the supplemental report she was creating when it was complete.

31. On January 29, 2011 Detective Malloy interviewed Mr. Jean-Guiles. He was advised of his Miranda rights and consented to being videotaped and audio recorded prior to starting the investigation.

32. During the investigation on the 29th Mr. Jean-guiles claimed again that he and Ms. White had conversations that where sexual in nature. He also claimed that they would often hug, but that her hug was "like when basketball players bump elbows" and she would say "no hug for you."

33. Mr. Jean-Guiles admitted to lying to Ms. Leon about the sexual comments and hugs, claiming that he failed to tell her those details because the interview was over the phone and that he "didn't think he needed to tell her everything."[2]

34. Mr. Jean-Guiles also claimed that Ms. White had a sexual relationship with another male coworker. Detective Malloy interviewed the coworker who denied the relationship, denied ever seeing or hearing Ms. White engage in any inappropriate behavior, and stated that he observed Mr. Jean-Guiles behaving in a sexually inappropriate manner towards several female coworkers including Ms. White. Those behaviors include but are not limited to lewd comments, brushing against the women physically, and asking them to give him hugs.

35. Detective Malloy made several attempt to interview the two managers from Davita. However, they refused to make themselves available.

---

[1] Detective Malloy attributed the delay to the weather, school cancellations, and Ms. White's schedule.

[2] Apparently, Ms. Leon conducted the investigation into the allegations from another state.

36. Detective Malloy then informed the Davita Investigator, Ms. Leon, that another staff member had corroborated the allegations of sexual harassment against Mr. Jean-Guiles.

37. Detective Malloy asked Ms. Leon to encourage the two managers to cooperate with her investigation. Ms. Leon stated that no such investigation or interview would take place unless Ms. Leon was present, or on the phone with them during the interview.

38. Detective Malloy informed Ms. Leon that she felt this was a substantial hindrance on the investigation due to the fact that a manager may be less likely to provide honest and forthcoming information if they were aware that prior complaints had been made but had not been forwarded to Human Resources. Ms. Leon refused to allow the interviews to go forward.

39. Detective Mallow then visited both managers at the Washington Street facility. Both managers advised the detective that they would not testify, or answer questions, without Ms. Leon being present. They advised the Detective that they "could lose their jobs" if they failed to follow this policy.

40. Even after these conversations with Detective Malloy, Davita took no action against the attacker and continued to demand that the Plaintiff work alongside her attacker until counsel intervened on behalf of Ms. White. Even after that, her attacker was not terminated from employment until a subsequent act of misconduct of a sexual nature involving a different employee

## Retaliation

41. On January 28, 2011 Ms. White was given a written disciplinary form for the first time in her several years with Davita. The discipline was allegedly for failing to call-out from work on January 27. On that particular day, she had attempted to call the office several times. There was a substantial snow storm (A "nor'easter") that day and the phones were not working that morning. She immediately sent an email to her manager.

42. Ms. White requested that her schedule be changed so that she did not have to see or work with Mr. Jean-guiles when she returned to work, or in the alternative, the she be transferred. Her request for a schedule change was denied and she was instructed to ask someone else about the transfer. On the morning of the 27th, Ms. White was so upset at the prospect of working near Mr. Jean-Guiles that she was vomiting and hyperventilating.

43. On the same day, January 28, Mr. Jean-Guile's wife forcefully and violently slammed a door into Ms. White. When Ms. White asked her what she was doing, his wife replied "you have no idea who you are fucking with."

44. Ms. White immediately reported both events to Ms. Ingrid Leon.

6

45. Based on information and belief, the investigation of Mr. Jean-Guiles was never re-opened by Ms. Leon after her multiple conversations with detective Malloy.

46. During the three weeks in which Ms. White was required to work the same schedule, she had nightmares every night and experienced anxiety, fear, vomiting, panic attacks, loss of appetite, and loss of self-esteem each and every day she went to work.

47. She accepted a new position on or about February 24, 2011. The new position paid less money and had less favorable hours to accommodate her master's degree courses.

48. During her final weeks at work Ms. White was subjected to retaliatory conduct from her coworkers who were friends with her attacker. Such conduct included making snide remarks to her, slamming doors on her, and staring at her in an intimidating manner. Ms. White did complain to Human Resources. Upon information and belief, no investigation was conducted and no corrective action was taken.

## Claims

### Count I - Sexual Harassment – Hostile Work Environment State Law Claim

49. The plaintiff incorporates paragraphs 1-48 by reference as if stated fully herein.

50. The plaintiff, through the acts and instances described herein, was subject to a hostile work environment because of her sex in violation of M.G.L. c. 151B.

51. The defendant, Davita Inc., is vicariously responsible for the discriminatory acts of its agents, employees, and or servants because they knew, should have known, and were notified of the hostile environment created by it's employee(s), agent(s), and or servant(s).

52. The Defendant is directly liable for it's failure to investigate and eradicate a claim of sexual harassment, for interfering with a police investigation, and for fostering and ratifying a hostile environment.

53. As a result, the plaintiff has suffered damages and continues to suffer damages to this day.

### Count II - Sexual Harassment – Hostile Work Environment – Federal

54. The plaintiff incorporates paragraphs 1-52 by reference as if stated fully herein.

55. The plaintiff, through the acts and instances described herein, was subject to a hostile work environment because of her sex in violation of Title VII.

56. The defendant, Davita Inc., is vicariously responsible for the discriminatory acts of its agents, employees, and or servants because they knew, should have known, and were notified of the hostile environment created by its employee(s), agent(s), and or servant(s).

57. The Defendant is directly liable for it's failure to investigate and eradicate a claim of sexual harassment, for interfering with a police investigation, and for fostering and ratifying a hostile environment.

58. As a result, the plaintiff has suffered damages and continues to suffer damages to this day.

### Count III - Retaliation –State

59. The plaintiff incorporates paragraphs 1-48 by reference as if stated fully herein.

60. The Plaintiff, through acts described herein, did engage in a protected activity as defined in M.G.L. c. 151B.

61. The defendant, through acts described herein, did retaliate against the plaintiff by subjecting her to discipline for false reasons, subjecting her to adverse employment actions, forcing her to work with her attacker, and allowing her coworkers to harass, annoy, threaten, and humiliate her without reprisal.

62. As a result, the plaintiff has suffered and continues to suffer damages.

### Count IV - Retaliation – Federal

63. The plaintiff incorporates paragraphs 1-62 by reference as if stated fully herein.

64. The Plaintiff, through acts described herein, did engage in a protected activity as defined in Title VII.

65. The defendant, through acts described herein, did retaliate against the plaintiff by subjecting her to discipline for false reasons, subjecting her to adverse employment actions, forcing her to work with her attacker, and allowing her coworkers to harass, annoy, threaten, and humiliate her without reprisal.

66. As a result, the plaintiff has suffered and continues to suffer damages.

### Count V - Constructive Discharge

67. The plaintiff incorporates paragraphs 1-66 by reference as if stated fully herein.

68. The plaintiff, through the acts defined herein, did engage in discussions with her employer in order to improve her working conditions that were not only fruitless,, but

8

also resulted in swift and severe retaliations including but not limited to disciplining her for false reasons, forcing her to work with her attacker, intentionally interfering with a police investigation, and allowing coworkers to harass, annoy, and humiliate her.

69. As a result Ms. White, as would any reasonable person, knew that the employer-employee relationship was irrevocably destroyed and that future attempts to remediate the situation would be equally fruitless.

70. Ms. White, as would any reasonable person, felt as if she was left with only two options: continue to endure the harassment or resign. She chose the latter.

71. As a result of the hostile environment, retaliation, and other malignant acts of the defendant Ms. White was constructively discharged as defined in M.G.L. 151B and other relevant state law.

72. As a result of the constructive discharge, Ms. White has suffered and continues to suffer damages.

## Constructive Discharge

73. The plaintiff incorporates paragraphs 1-72 by reference as if stated fully herein.

74. The plaintiff, through the acts defined herein, did engage in discussions with her employer in order to improve her working conditions that were not only fruitless,, but also resulted in swift and severe retaliations including but not limited to disciplining her for false reasons, forcing her to work with her attacker, intentionally interfering with a police investigation, and allowing coworkers to harass, annoy, and humiliate her.

75. As a result Ms. White, as would any reasonable person, knew that the employer-employee relationship was irrevocably destroyed and that future attempts to remediate the situation would be equally fruitless.

76. Ms. White, as would any reasonable person, felt as if she was left with only two options: continue to endure the harassment or resign. She chose the latter.

77. As a result of the hostile environment, retaliation, and other malignant acts of the defendant Ms. White was constructively discharged as defined in Title VII.

78. As a result of the constructive discharge, Ms. White has suffered and continues to suffer damages.

## Conclusion

Based on all of the above, Ms. White respectfully requests that this honorable Court:

1. Enter judgment in her favor on all counts;

2. Award her backpay, costs, and interest dating back to the day she was constructively discharged;

3. Award her money damages to compensate her for emotional distress;

4. Award punitive damages based on the shocking and outrageous behavior of the defendant and based on the intentional violation of her federally protected rights;

5. Issue a permanent injunction mandating that the defendant cease and desist engaging in discriminatory practices;

6. Grant any other award this Court deems to be just and proper.

***The plaintiff demands a trial by jury on all issues so triable.***

By her attorney,

/s/ John T. Martin
John T. Martin
Mann & Martin LLP
1071 Worcester Road, Suite 42
Framingham, MA 01701
508-270-0500
BBO# 676344