## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                      )
**VENIFA WHITE,**                     )
                                      )
       **Plaintiff,**           )
                                      )
       **v.**                    )       **Civil Action No. 12-10964-DJC**
                                      )
**DAVITA, INC.,**                     )
                                      )
       **Defendant.**          )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                           **January 3, 2013**

### I.    Introduction

Plaintiff Venifa White ("White") accuses her former employer, DaVita, Inc. ("DaVita") of creating a hostile work environment based on sexual harassment, retaliation and constructive discharge in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et. seq.</u> ("Title VII"), and Mass. Gen. L. c. 151B ("Chapter 151B"). DaVita has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that White has failed to exhaust her administrative remedies, the claims are time-barred and that White has failed to state a claim upon which relief can be granted. For the reasons discussed below, the Court DENIES the motion to dismiss.

### II.    Burden of Proof and Standard of Review

In consideration of a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 2007). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the

speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. at 555 (internal citation omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009) (quoting Twombly, 550 U.S. at 556).  "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief."  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (omission in original) (quoting Sepúlveda-Villarini v. Dep't. of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010) (Souter, J.)) (internal quotation marks omitted). "Although evaluating the plausibility of a legal claim 'requires the reviewing court to draw on its judicial experience and common sense,' the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  Id. (citations omitted).  "Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely.'"  Id. at 12–13 (omission in original) (quoting Twombly, 550 U.S. at 556).  "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint."  Id. at 13.

## III.   Factual Allegations

Unless otherwise noted, the relevant facts are as alleged in the complaint.

DaVita is a national corporation with a place of business in Brookline, Massachusetts. Compl. ¶ 2.  White has a bachelor's degree in nursing and is currently working towards obtaining a master's degree.  Id. ¶ 6.  She worked as a nurse for DaVita for several years until February 2011.  Id. ¶ 7.  Stahl Jean-Guiles ("Jean-Guiles") was White's coworker at the Brookline facility. Id. ¶ 8.

A.      __Jean-Guiles's Harassment of White Prior to January 11, 2011__

In the months leading up to January 11, 2011, Jean-Guiles engaged in a pattern of sexually inappropriate conduct including touching White's back and legs on several occasions. Id. ¶¶ 9, 10.  On one such occasion, White was bending over to pick up a needle and Jean-Guiles attempted to rub his crotch and legs against her buttocks.   Id. ¶ 10.   White also caught Jean-Guiles leering at her breasts, cleavage and backside in such a way that made her feel uncomfortable and degraded on countless occasions.  Id. ¶ 12.  Jean-Guiles also made several inappropriate comments of a sexual nature to White.  Id. ¶ 11.  Jean-Guiles would repeatedly ask White out; an invitation that she always rejected.  Id. ¶ 13.  He would also ask White for her cell phone number so that he could call her outside of work.  Id.  When White declined to give the number to him, he called her home and asked her minor child for the number under the pretext that White had an emergency at work and he needed to get in touch with her on her cell phone right away.  Id. ¶¶ 13, 14.  White made several complaints about Jean-Guiles's behavior to managers and coworkers and was informed that Jean-Guiles was married to a manager at the facility and that making complaints would only "cause trouble for her."  Id. ¶ 15.

B.      __Assault on January 11, 2011__

On January 11, 2011, White stayed at the facility after closing time to finish work.  Id. ¶ 16.  White was cleaning dishes in the kitchen area and believed that she was alone in the building.  Id.  Jean-Guiles entered the room behind her and did not speak until he was close enough to put his hands on her shoulders.  Id. ¶ 17.  White was frightened and turned around at which point Jean-Guiles placed his hands on her shoulders and said, "give me a hug."  Id.  White refused and Jean-Guiles pinned her to the wall by her shoulders and attempted to hug and kiss

her, only letting go when she began to scream.  Id. ¶¶ 17, 19.  White believed that he intended to rape her.  Id. ¶ 19.

        **C.**        **<u>Investigations of the Assault</u>**

        *1.*       *DaVita's Investigation*

The following day, on January 12, 2011, White informed her supervisor, Kathleen Smith, about the assault.  Id. ¶ 20.  White was informed that an investigation would be conducted by Ingrid Leon from human resources.  Id.  White informed Leon of the following:  (1) that she could not work with Jean-Guiles and asked that their schedules be changed so that she would not need to work with him; (2) the details of the attack and the other sexual attention that Jean-Guiles directed at her; and (3) the names of other coworkers who could substantiate and corroborate her claims regarding Jean-Guiles's behavior.  Id. ¶ 21.  Leon conducted the investigation of White's allegations from another state.  Id. ¶ 33 n.2. On January 24, 2011, Leon told White that her allegations could not be substantiated, that she was expected to return to work and that she would be scheduled to work with Jean-Guiles.  Id. ¶ 22–23.

        *2.*       *The Police Investigation*

White contacted the Brookline Police Department on January 17, 2011, less than a week after the alleged assault.  Id. ¶ 24.  A member of the Department initially interviewed White and also interviewed Jean-Guiles who claimed in the interview that he and White engaged in several consensual sexual conversations and that on January 11, 2011, he tried to hug her, but she did not want to hug him back.  Id. ¶¶ 24, 25, 26.  On January 19, 2011, Brookline Detective Malloy took up the investigation and interviewed White on January 28, 2011.  Id. ¶ 27.  Detective Malloy contacted Leon and informed her that Jean-Guiles, while being interviewed by the police, had admitted that he had made sexual comments to and tried to hug White.  Id. ¶ 29.  Leon stated that

she would re-open the investigation and await the results of the police investigation.  Id.
Detective Malloy faxed a copy of the original police report to Leon and promised to send her a
copy of the supplemental report she was creating when complete.  Id. ¶ 30.

On January 29, 2011, Detective Malloy interviewed Jean-Guiles, who was advised of his
Miranda rights and consented to being videotaped and audio recorded.  Id. ¶ 31.  During the
interview, Jean-Guiles claimed that he and White would have sexual conversations.  Id. ¶ 32.  He
also claimed that they would often hug, but White's hug was "like when basketball players bump
elbows" and she would say "no hug for you."  Id.  Jean-Guiles admitted to lying to Leon about
the sexual comments and hugs, claiming that he failed to disclose those details because the
interview was over the phone and that he "didn't think he needed to tell her everything."  Id.
¶ 33.  He also claimed that White had a sexual relationship with another male coworker, id. ¶ 34,
but this coworker denied the relationship, denied ever seeing or hearing White engage in any
inappropriate behavior and said that he had observed Jean-Guiles behaving in a sexually
inappropriate manner towards several female coworkers, including White.  Id.

Detective Malloy made several attempts to interview two managers from DaVita, but
they refused to make themselves available.  Id. ¶ 35.  Detective Malloy then informed Leon that
another staff member had corroborated White's sexual harassment allegations and asked her to
encourage the two managers to cooperate with her investigation.  Id. ¶¶ 36, 37.  Leon stated that
no such interview could take place unless Leon was present or on the phone with them.  Id. ¶ 37.

Detective Malloy then visited both managers at the Brookline facility, but both managers
advised her that they would not testify, or answer questions, without Leon being present.  Id.
¶ 39.  They advised Detective Malloy that they "could lose their jobs" if they failed to follow this
policy.  Id.

Even after these conversations with Detective Malloy, DaVita never reopened the investigation and took no action against Jean-Guiles and continued to require that White be scheduled to work with him until White's counsel intervened.  Id. ¶¶ 40, 45.  Jean-Guiles was not terminated from his employment until a subsequent act of sexual misconduct involving a different employee.  Id. ¶ 40.

### D.   Retaliation Against White

On January 28, 2011, approximately two weeks after she had complained about the assault to DaVita, White was disciplined for the first time in her years as a DaVita employee.  Id. ¶ 41.  The discipline was for allegedly failing to "call-out" from work the day before.  Id.  On the morning of January 27, 2011, White was so upset at the prospect of working near Jean-Guiles that she was physically ill.  Id. ¶ 42.  She attempted to call the office several times, but there was a substantial snowstorm, and the phones were not working.  Id. ¶ 41.  She immediately sent an email to her manager and requested that her schedule be changed so that she did not have to see or work with Jean-Guiles when she returned to work, or in the alternative, that she be transferred.  Id. ¶¶ 41, 42.  White's request for a schedule change was denied and she was instructed to ask someone else about the transfer.  Id. ¶ 42.

On January 28, 2011, Jean-Guiles's wife forcefully and violently slammed a door into White and said "you have no idea who you are fucking with."  Id. ¶ 43.  White immediately reported this event and the disciplinary action to Leon.  Id. ¶ 44.

During the three weeks in which White was required to work the same schedule as Jean-Guiles, she had nightmares and experienced anxiety, fear, vomiting, panic attacks and loss of appetite and self-esteem.  Id. ¶ 46.  On or about February 24, 2011, White accepted a new position that paid less money and had less favorable hours to accommodate her master's degree

courses.  Id. ¶ 47.  During her final weeks at work, White was subjected to conduct from coworkers who were friends with Jean-Guiles including snide remarks, slamming doors and staring at her in an intimidating manner.  Id. ¶ 48.  White complained to human resources, but she alleges that DaVita conducted no investigation and took no corrective action.  Id.

## IV.    Procedural History

On November 29, 2011, White filed a charge with the Massachusetts Commission Against Discrimination ("MCAD").  Def. Ex. A, D. 6-1 ("MCAD Charge").[1]  The MCAD Charge claimed hostile work environment based on sexual harassment, failure to investigate and retaliation.  Id. ¶¶ 41–43.[2]  On April 24, 2012, the MCAD investigating commissioner informed the parties that White intended to file a civil action and the MCAD Charge was dismissed without prejudice as to the merits pursuant to Mass. Gen. L. c. 151B, § 9.  Def. Ex. C, D. 6-3. White filed the instant complaint on May 30, 2012 asserting claims of hostile work environment

---

[1] "[C]laims filed with either the MCAD or the EEOC are effectively filed with both agencies." Davis v. Lucent Techs., Inc., 251 F.3d 227, 230 n.1 (1st Cir. 2001).

[2] "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  However, "[w]hen . . . a complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (alteration and omission in original) (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16–17 (1st Cir. 1998)) (internal quotation marks omitted).  Accordingly, consistent with the relevant standard, the Court has considered White's MCAD Charge and a letter from the MCAD investigating commissioner notifying the parties that White intended to file a civil action, Def. Ex. C, D. 6-3, which were attached as exhibits to DaVita's motion to dismiss, for the purposes of determining whether White has exhausted her administrative remedies.  See Fant v. N.E. Power Serv. Co., 239 F.3d 8, 12 (1st Cir. 2001).  DaVita also attaches its Position Statement as an exhibit; however, to the extent that DaVita relies upon its version of the facts as presented in that statement to contradict the facts White alleges in the complaint, such facts are not properly considered by the Court for the purposes of a motion to dismiss, where the Court must accept the plaintiff's factual allegations as true.  See Ocasio-Hernández, 640 F.3d at 10.

based upon sexual harassment (Counts I and II), retaliation (Counts III and IV) and constructive discharge (Counts V and VI) under Title VII and Chapter 151B.  Compl. ¶¶ 49–78.  DaVita has now moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).  D. 5.

## V.   Discussion

### A.   <u>Exhaustion</u>

DaVita argues that White's constructive discharge and retaliation claims (Counts III–VI) are barred because they are beyond the scope of White's administrative charge.  Def. Mem. at 9–12.  "Both Title VII and Chapter 151B require an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination."  <u>Lattimore v. Polaroid Corp.</u>, 99 F.3d 456, 464 (1st Cir. 1996).  Filing an administrative charge "gives notice to both the employer and the [MCAD or EEOC] of an alleged violation and affords an opportunity to swiftly and informally take any corrective action necessary to reconcile the violation."  <u>Thornton v. UPS, Inc.</u>, 587 F.3d 27, 31 (1st Cir. 2009) (citing <u>Powers v. Grinnell Corp.</u>, 915 F.2d 34, 37 (1st Cir. 1990)).  In light of this purpose, "[t]he scope of the civil complaint is . . . limited by the charge filed with the EEOC [or MCAD] and the investigation which can reasonably be expected to grow out of that charge."  <u>Lattimore</u>, 99 F.3d at 464 (first alteration and omission in original) (quoting <u>Powers</u>, 915 F.2d at 38).  As the First Circuit has explained, "the scope of a civil action is not determined by the specific language of the charge filed with the agency, but rather, may encompass acts of discrimination which the MCAD investigation could reasonably be expected to uncover."  <u>Davis</u>, 251 F.3d at 233 (quoting <u>Conroy v. Bos. Edison Co.</u>, 758 F. Supp. 54, 58 (D. Mass. 1991)) (internal quotation marks omitted).  "[A]n employee is not required to comprehensively set forth with 'literary exactitude' all of the facts and theories upon which his or her claim is based."  <u>Lattimore</u>, 99 F.3d at 464 (quoting

<u>Powers</u>, 915 F.2d at 39).  The scope of the suit is "nonetheless constrained by those allegations in the sense that the judicial complaint must bear some close relation to the allegations presented to the agency." <u>Jorge v. Rumsfeld</u>, 404 F.3d 556, 565 (1st Cir. 2005).

<em>1.    White Has Exhausted Her Constructive Discharge Claims</em>

DaVita argues that White's constructive discharge claims do not fall within the scope of the MCAD investigation because White failed to plead in the MCAD Charge facts "evidencing intolerable working conditions and looming indignities which would have compelled White to resign."  Def. Mem. at 11.  To establish a claim for constructive discharge under Title VII and Chapter 151B, a "plaintiff must prove that his employer imposed 'working conditions so intolerable [ ] that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities.'" <u>Landrau-Romero v. Banco Popular De P.R.</u>, 212 F.3d 607, 613 (1st Cir. 2000) (alteration in original) (quoting <u>Simas v. First Citizens' Fed. Credit Union</u>, 170 F.3d 37, 46 (1st Cir. 1999)) (internal quotation marks omitted); <u>accord</u> <u>GTE Prods. Corp. v. Stewart</u>, 421 Mass. 22, 34 (1995).

As alleged in the complaint, White bases her constructive discharge claims on the fact that she "engage[d] in discussions with her employer in order to improve her working conditions that were not only fruitless, but also resulted in swift and severe retaliations including but not limited to disciplining her for false reasons, forcing her to work with her attacker, intentionally interfering with a police investigation, and allowing coworkers to harass, annoy, and humiliate her."  Compl. ¶¶ 68, 74.  In both the complaint and the MCAD Charge, White alleges that she "accepted a new position on or about February 24, 2011" that "paid less money and had less favorable hours to accommodate her master's degree courses."  MCAD Charge ¶ 40; Compl. ¶ 47.  Also, in the MCAD Charge, White relates the same events that occurred prior to her taking

9

a new position as those alleged in the complaint, such as (1) on January 28, 2011 she was disciplined for the first time, MCAD Charge ¶ 33; Compl. ¶ 41; (2) her request for a schedule change so that she did not have to see or work with Jean-Guiles was denied, MCAD Charge ¶ 34; Compl. ¶ 42; (3) on January 28, 2011 Jean-Guiles's wife slammed a door into her and said "you have no idea who you are fucking with," MCAD Charge ¶ 35; Compl. ¶ 43; (4) Leon never reopened the investigation of Jean-Guiles, MCAD Charge ¶ 37; Compl. ¶ 45; and (5) during the three weeks in which she had to work the same schedule as Jean-Guiles she experienced nightmares, anxiety, fear, vomiting, panic attacks and loss of appetite and self-esteem.  MCAD Charge ¶ 39; Compl. ¶ 46.  On this record, the constructive discharge claims are reasonably related to claims presented to the MCAD and could reasonably have grown out of an MCAD investigation.  Accordingly, the constructive discharge claims would not have evaded the MCAD's scrutiny because the basis for the claims was presented in the MCAD Charge.  See Tayag v. Lahey Clinic Hosp., Inc., 677 F. Supp. 2d 446, 454 (noting that "[t]he purpose of the administrative filing is '(1) to provide the MCAD with an opportunity to investigate and conciliate the claim of discrimination; and (2) to provide notice to the defendant of potential liability'" (quoting Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 531 (2001))).

> ## 2.     White Has Exhausted Her Retaliation Claims

DaVita also argues that White's retaliation claims do not fall within the scope of the MCAD investigation.  Def. Mem. at 11–12.  "An employment-discrimination complaint is limited to the charges filed before the EEOC/MCAD and to all claims reasonably within the scope of the agency's investigation."  Ianetta v. Putnam Invs., Inc., 142 F. Supp. 2d 131, 134 (D. Mass. 2001).  The MCAD Charge specified that retaliation was one of her claims, thereby

explicitly informing MCAD of the claim.  MCAD Charge ¶ 43; <u>see</u> <u>Ianetta</u>, 142 F. Supp. 2d at 134.

In support of its argument that White has failed to exhaust her administrative remedies on her retaliation claims, DaVita argues that the following "retaliatory conduct" allegation in the complaint does not appear in the MCAD Charge:

> During her final weeks at work Ms. White was subjected to retaliatory conduct from her coworkers who were friends with her attacker.  Such conduct included making snide remarks to her, slamming doors on her, and staring at her in an intimidating manner.  Ms. White did complain to Human Resources.  Upon information and belief, no investigation was conducted and no corrective action was taken.

Compl. ¶ 48; Def. Mem. at 11.  However, the scope of the complaint is not strictly limited to the allegations in the administrative filing.  <u>Jorge</u>, 404 F.3d at 565; <u>see also</u> <u>Perch v. City of Quincy</u>, 204 F. Supp. 2d 130, 133 (D. Mass. 2002) (noting that "a plaintiff's civil complaint need not be an exact replica of her administrative charge to meet the Chapter 151B filing requirement").  "An administrative charge is not a blueprint for the litigation to follow."  <u>Powers</u>, 915 F.2d at 38.  Because the scope of the instant suit is not strictly limited to the precise language in the MCAD Charge, the Court looks to the investigation that could reasonably be expected to grow out of White's MCAD Charge.  In the MCAD Charge, White alleged, in relevant part, that:  (1) she was disciplined on January 28, 2011, MCAD Charge ¶ 33; (2) she was denied a schedule change on January 27, 2011 and was forced to work with her attacker, <u>id.</u> ¶¶ 34, 39; and (3) Jean-Guiles's wife's behavior on January 28, 2011.  <u>Id.</u> ¶ 35.  Accordingly, additional allegations relevant to retaliation, including additional possible retaliatory conduct leading up to her taking a new job, could reasonably be expected to have come under administrative investigation.  Thus, White's retaliation claims fall within the scope of the MCAD Charge.

## B.    <u>Statute of Limitations</u>

DaVita argues that all of White's claims must be dismissed because they are time-barred under Chapter 151B and Title VII. Def. Mem. at 4–8. Under both Chapter 151B and Title VII, a plaintiff must file an administrative charge with the MCAD or EEOC within 300 days of the occurrence of the alleged harassing or discriminatory events. Mass. Gen. L. c. 151B, § 5; 42 U.S.C. § 2000e-5(e)(1); Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 40 (1st Cir. 2011) (noting that "[b]oth the federal and state provisions require that a charge be filed within 300 days of the alleged unlawful employment practice"). White filed her MCAD Charge on November 29, 2011. MCAD Charge at 4. Thus, for the events underlying her claims to fall within the statute of limitations, they must have occurred on or after February 2, 2011.

### 1.   *Constructive Discharge*

DaVita asserts that White's constructive discharge claims, presented in Counts V and VI, are not timely. Def. Mem. at 4–8. A constructive discharge claim accrues at the time of the employee's resignation. See Ziehm v. Radioshack Corp., No. 09-69-P-S, 2010 WL 2079550, at *27 (D. Me. May 22, 2010) (collecting cases), adopted by 2010 WL 2680024 (July 1, 2010). White accepted a new position on or about February 24, 2011, Compl. ¶ 47, which is within the limitations period. Accordingly, Counts V and VI are not time-barred.

### 2.   *Hostile Work Environment Claims Based on Sexual Harassment*

Whether White's hostile work environment claims (Counts I and II) are time-barred requires more analysis. Those claims are based in part on conduct outside of the limitations period. Even so, both Massachusetts law and federal law, under certain circumstances, allow a sexual harassment plaintiff to recover for conduct that occurred outside of the limitations period. In Massachusetts, under the "continuing violation doctrine," a plaintiff may recover for events outside of the statute of limitations period if those events were part of "an ongoing pattern of

discrimination" and there was "a discrete violation within the [300 day] limitations period to anchor the earlier claims." Cuddyer, 434 Mass. at 532. For the continuing violation doctrine to apply, a complainant must allege that: (1) at least one instance of discrimination occurred within the limitations period; (2) the alleged timely discriminatory acts had a substantial relationship to the alleged untimely discriminatory acts; and (3) she could not have formed a reasonable belief at the time of the pre-limitations period events that they were actionable. Ocean Spray Cranberries, Inc. v. MCAD, 441 Mass. 632, 642–43 (2004).

Under federal law, at least as to hostile work environment claims under Title VII, the Supreme Court has provided guidance. In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court explained that, under Title VII, a "hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Id. at 117 (quoting 42 U.S.C. § 20003-5(e)(1)). Unlike a discrete instance of discrimination, "such as termination, failure to promote, denial of transfer, or refusal to hire," a hostile work environment by its "very nature involves repeated conduct," and "therefore cannot be said to occur on any particular day." Id. at 114–15. Based on that premise, the Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory period." Id. at 105. The Court explained that it does not matter if an employee knew, partway through the course of harassing conduct and outside of the limitations period, that a Title VII claim had accrued. See id. at 118.[3] As the First Circuit has explained, Morgan

---

[3] The Morgan Court illustrated this point with these hypotheticals:

> (1) Acts on days 1–400 create a hostile work environment. The employee files the charge on day 401. . . . (2) Acts contribute to a hostile environment on days 1–

"explicitly rejected the view . . . that 'the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct.'" Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting Morgan, 536 U.S. at 117–18).[4]

Here, DaVita argues that White's hostile work environment claims based on sexual harassment are time-barred because White was aware that she experienced actionable sexual harassment prior to February 2. Def. Mem. at 5–7. In light of Morgan's rejection of any such knowledge requirement in the Title VII context, this argument is unavailing as to White's Title VII hostile work environment claim, because that claim encompasses post-February 2 events, in particular the allegation that White was required to work with Jean-Guiles even after the attack,

---

> 100 and on day 401, but there are no acts between days 101–400. . . . [T]here is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim happened; on day 401 all incidents are still part of the same claim.

536 U.S. at 118.

[4] In support of her argument that her hostile work environment claim is timely, White made reference to "serial" and "systemic" continuing violations in her opposition and at oral argument. Prior to Morgan, federal courts distinguished between two types of continuing violations, "serial" and "systemic." See Brissette v. Franklin Cnty., Sheriff's Office, 235 F. Supp. 2d 63, 86 (D. Mass. 2003) (noting that "[u]p until recently, decisional authority drew a distinction between two types of continuing violations: serial and systemic"). After Morgan, it is "no longer necessary" for a factfinder to make a distinction between a serial or systematic violation "when considering the timeliness of a hostile work environment claim" under Title VII. Crowley v. L.L. Bean, Inc., 303 F.3d 387, 406 (1st Cir. 2002) (noting that "Morgan supplants [the First Circuit's] jurisprudence on the continuing violation doctrine in hostile work environment claims, making it no longer necessary to distinguish between systemic and serial violations"); see also Vil v. Price Waterhousecoopeers LLP, No. 11-10780-GAO, 2012 WL 3202852, at *7 n.4 (D. Mass. Aug. 2, 2012).

that allegedly formed part of one cohesive hostile work environment.[5]  "[I]n order to comply with the statute of limitations [under Title VII], 'the employee need only file a charge within [300] days of any act that is part of the hostile work environment.'"  Marrero, 304 F.3d at 18 (second alteration in original) (quoting Morgan, 536 U.S. at 118).  Because White has done so, Count II is not time-barred.

DaVita's argument has more force as to Count I under Massachusetts law, which, as described above, where application of the continuing violation doctrine requires a showing of "whether the plaintiff knew or reasonably should have known before [the statute of limitations] period that the work situation was pervasively hostile and unlikely to improve."  Pelletier v. Town of Somerset, 458 Mass. 504, 521 (2010); Brissette, 235 F. Supp. 2d at 87–88 (noting that this inquiry is not required under Title VII).  White's complaint describes a "pattern of inappropriate sexual conduct" on Jean-Guiles's part in the "months leading up to January 11, 2011."  Compl. ¶ 9.  These allegations include unwelcome touching, vulgar sexual comments, leering and an attempt to dupe her child into giving him White's personal cell phone number.  See id. ¶¶ 10–14.  White also alleges that she "made several complaints to managers" about Jean-Guiles's behavior prior to January 11 and was informed that making complaints would only "cause trouble for her."  Id. ¶ 15.  Although the Court agrees with DaVita that, taking these allegations as true, it might be reasonable to conclude that White "knew or reasonably should have known that her work situation was pervasively hostile" at least as of January 11, 2011, the date of her assault, the Court cannot say on the limited record before it that her work situation was "unlikely to improve."  Cuddyer, 434 Mass. at 539.  Here, the facts in Cuddyer are

---

[5] DaVita asserts that discovery will bear out that White never worked the same shift as Jean-Guiles after she reported his behavior on January 12, 2011.  Def. Mem. at 10.  However, for the purposes of a motion to dismiss (and not a motion for summary judgment on a record developed in discovery), the Court must accept White's allegations that she worked the same shift as Jean-Guiles after the attack as true.  See Ruiz, 496 F.3d at 5.

instructive.  There, the Supreme Judicial Court concluded that the plaintiff was "entitled to the benefit of the continuing violation doctrine to defeat the defendant's motion for summary judgment" where even when her first harasser was reinstated to work and she endured unwelcome advances from another co-worker, a jury could reasonably find that events "left the plaintiff with the sense that conditions might improve if she kept a low profile."  Id. at 540. Here, although White alleges that DaVita failed to take any action on her complaints regarding Jean-Guiles after the January 11th incident, her complaint to the police on January 17, 2011 had initiated a criminal investigation that had prompted contact with DaVita and continued for a number of weeks and DaVita eventually fired Jean-Guiles.  Compl. ¶ 40.  That is, it cannot be said, based on the allegations in the complaint before the Court on this motion to dismiss, that White's work situation was so hopeless that it was unreasonable for her to delay bringing discrimination charges.  This is particularly true where a hostile work environment "constitutes a pattern of sexual harassment . . . that, by its very nature, often is apparent only in hindsight," Cuddyer, 434 Mass. at 538, and courts should be wary about declaring that a plaintiff should have complained of a hostile environment earlier than she did.  See id. at 540 (explaining that Massachusetts does not bar such claims "unless [the plaintiff's] delay in initiating the lawsuit, considered under an objective standard, was unreasonable"); see also Clifton v. MBTA, 445 Mass. 611,621–22 (2005) (ruling that defendant was entitled to a Cuddyer jury instruction).

### 3.    Retaliation for Complaining about Sexual Harassment

DaVita likewise challenges White's retaliation claims, presented in Counts III and IV, as untimely.  Def. Mem. at 4–8.  White alleges that DaVita retaliated against her for complaining about Jean-Guiles's harassing behavior by:  (1) subjecting her to discipline for false reasons; (2) forcing her to continue to work with him; and (3) allowing White's coworkers to harass, annoy,

threaten and humiliate her without consequence.  Compl. ¶¶ 61, 65.  As discussed below, the Court understands White to allege that these actions combined to create a retaliatory hostile work environment.  In turn, that conclusion establishes that White's retaliation claims are timely.  To begin with, the majority of the conduct that White alleges created the retaliatory hostile environment occurred within the limitations period; the only event that predates February 2 is the allegedly pretextual disciplinary action that occurred on January 28, 2011, but the other retaliatory action allegedly occurred after February 2 and before White left the company for another position.  Accordingly, given these allegations, the motion to dismiss Counts III and IV as time-barred is denied.

### C.   Retaliation Claims Under Title VII and Chapter 151

DaVita also asserts that White has failed to state a claim for retaliation under both Title VII and Chapter 151B because:  (1) she has failed to allege an adverse employment action; and (2) her allegations are generalized and conclusory.  Def. Mem. at 12–14.  Under Title VII and Chapter 151B's anti-retaliation provisions, a plaintiff must plead a prima facie case consisting of three elements:  (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.  Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011) (Title VII); Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011) (Chapter 151).

Here, given White's arguments that she was subjected to a hostile environment until at least as late as February 23, 2011, see Pl. Opp. at 3, the Court construes White's retaliation claims as claims for a retaliatory hostile work environment.  Under both Massachusetts law and Title VII, subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an actionable adverse employment action.  Noviello v. City of Boston, 398

F.3d 76, 89–91 (1st Cir. 2005) (explaining that, "under Title VII, the creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action," and is also "an adverse employment action cognizable under chapter 151B, § 4(4)"); see also Clifton, 445 Mass. at 616 (noting that "unlawful retaliation . . . may . . . consist of a continuing pattern of behavior").  Claims of a retaliatory hostile environment are evaluated under the same framework as are discriminatory hostile environment claims.  Noviello, 398 F.3d at 92.  "In order to prove a hostile work environment, a plaintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment."  Id.  The harassing environment must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  "In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Noviello, 398 F.3d at 92 (quoting Faragher, 524 U.S. at 787–88).  The court must "distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment."  Id.  Furthermore, in the context of a retaliatory hostile work environment, "[i]t is only those actions, directed at a complainant, that stem from a retaliatory animus which may be factored into the hostile work environment calculus."  Id. at 93.

White alleges that she was forced to work with her attacker in retaliation for her complaints regarding Jean-Guiles.  A reasonable person could certainly find being forced to work with her attacker to be "physically threatening" and "humiliating" and to "interefere[] with

[her] work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). White also alleges that the January 28, 2011 disciplinary action against her was in retaliation for her complaints and that she was further exposed to retaliatory conduct by colleagues friendly with Jean-Guiles and his wife during the final weeks of her employment at DaVita. [6] "[T]he case law recognizes that false accusations of misconduct can contribute to the creation of a hostile work environment." Noviello, 398 F.3d at 93. White alleges that on January 28, 2011, Jean-Guiles's wife slammed a door into her, compl. ¶ 43, and that "during her final weeks at work," she was "subjected to retaliatory conduct from her coworkers who were friends with her attacker [and] [s]uch conduct included making snide remarks to her, slamming doors on her, and staring at her in an intimidating manner." Id. ¶ 48. That White's coworkers placed her at risk of physical harm "is a cogent indicator of an adverse change in the conditions of the plaintiff's employment." Noviello, 398 F.3d at 94. Furthermore, "snide comments" and "intimidating" stares may contribute to the hostile work environment. See id. at 93 (noting that "harassing insults directed at the plaintiff are likewise entitled to some weight in the [retaliatory hostile work environment] calculus").

DaVita argues that White's allegations regarding the "retaliatory conduct from her coworkers who were friends with her attacker" are "generalized" and "conclusory" and therefore should be dismissed. Def. Mem. at 14. But White has done more than make an "unadorned, the-

---

[6] White seeks to hold DaVita liable for the conduct of its employees. Compl. ¶ 3. "When coworkers, rather than supervisors, are responsible for the creation and perpetuation of a hostile work environment, Title VII and chapter 151B seem essentially coterminous as they relate to employer liability. . . . [I]n such situations, an employer can only be liable if the harassment is causally connected to some negligence on the employer's part." Noviello, 398 F.3d at 95. "In other words, the plaintiff must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." Wilson v. Moulison N. Corp., 639 F.3d 1, 7 (1st Cir. 2011). Here, White alleges that she reported her coworkers' conduct to human resources, but "no investigation was conducted and no corrective action was taken." Compl. ¶ 48.

defendant-harmed-me accusation," Iqbal, 556 U.S. at 678, and has described the type of conduct she alleges to be retaliatory or harassing and who was subjecting her to this conduct.   Her allegations do not simply parrot the elements of her claims.   Furthermore, the Supreme Court does not require heightened fact pleading in employment discrimination cases; "a complaint need only allege enough facts to state a claim to relief that is plausible on its face."   See Twombly, 550 U.S. at 569–70 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 512, 514 (2002)). "In order to defeat a Fed. R. Civ. P. 12(b)(6) motion, a complaint must contain 'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the claims." Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009) (quoting Twombly, 550 U.S. at 556).   Accordingly, taking all of the plaintiff's allegations as true and drawing all inferences in the plaintiff's favor, the Court finds that White has plausibly pled that she was subject to retaliation and the Court denies DaVita's motion to dismiss Counts III and IV.

**VI.    Conclusion**

For the reasons discussed above, the Court DENIES the motion to dismiss.

**So ordered.**

/s/ Denise J. Casper
United States District Judge